**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>–v.–<br>PETER K. NAVARRO,<br>*Defendant*. | Case No. 1:22-cv-2292 |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION....1

BACKGROUND....1

I. The Presidential Records Act....1

II. Factual Background....3

ARGUMENT....8

CONCLUSION....11

## TABLE OF AUTHORITIES

### Cases

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991)....1

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988)....9, 10

*Citizens for Resp. & Ethics in Washington v. Trump*,
924 F.3d 602 (D.C. Cir. 2019)....1

*Harrell v. United States*,
13 F.3d 232 (7th Cir. 1993)....10

*Hunt v. DePuy Orthopaedics, Inc.*,
729 F. Supp. 2d 231 (D.D.C. 2010)....9

*Loeffler v. Frank*,
486 U.S. 549 (1988)....2

*Nixon v. United States,*
978 F.2d 1269 (D.C. Cir. 1992)....1

*Powers v. U.S. Postal Ser.*,
671 F.2d 1041 (7th Cir. 1982)....10

**Statutes**

22 U.S.C. § 2201 .......... 8

42 U.S.C. § 2202 .......... 10

44 U.S.C. § 2201 .......... 2, 3, 6

44 U.S.C. § 2202 .......... 2, 3

44 U.S.C. § 2203 .......... 2, 3, 10

44 U.S.C. § 2204 .......... 2

44 U.S.C. § 2209 .......... 2, 3

44 U.S.C. § 2201 .......... 1, 2

44 U.S.C. § 2202 .......... 1

44 U.S.C. § 2205 .......... 2

44 U.S.C. § 2209 .......... 2, 3, 8

50 U.S.C. § 4501 .......... 4

D.C. Code 16-3701 .......... 9

**Rules**

Federal Rule of Civil Procedure 64 .......... 8

**Other Authorities**

17A Moore's Federal Practice – Civil (2022) .......... 10

ProtonMail,
https://proton.me/privacy .......... 5

Replevin,
7 American Law of Torts .......... 9

Replevin,
77 Corpus Juris Secondum .......... 9

## INTRODUCTION

Defendant Peter K. Navarro served as a senior White House advisor from January 2017 until January 2021. During his employment, he was subject to the terms of the Presidential Records Act, which vests the United States with "complete ownership" of "Presidential records," a term that encompasses documentary materials created or received by "the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. §§ 2201(2), 2202.

There is no genuine dispute of fact that Dr. Navarro used at least one unofficial email account to conduct official business, that those records are the property of the United States, and that Dr. Navarro has refused to return the records to the United States. Indeed, his counsel has expressly admitted as much. Because Dr. Navarro remains in possession of property that belongs to the United States, this Court should issue a writ of replevin requiring Dr. Navarro to return what he wrongfully continues to possess.

## BACKGROUND

### I. The Presidential Records Act

Prior to the Nixon Administration, Presidential records were generally regarded as the President's personal property. *See Nixon v. United States,* 978 F.2d 1269, 1277 (D.C. Cir. 1992) ("History, custom, and usage indicate unequivocally that, prior to [the enactment of the PRA], Presidents exercised complete dominion and control over their presidential papers."). "[I]n the wake of Watergate and the ensuing struggle over Congress's authority to access former-President Nixon's records," *Citizens for Resp. & Ethics in Washington v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019), Congress enacted the PRA, 44 U.S.C. §§ 2201 *et seq.*, "to establish the public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office," *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991).

According to the PRA, the term "Presidential records" means, with certain conditions and exceptions, "documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2); Statement of Material Facts (SMF) ¶ 8. The PRA also states that Presidential records are the property of the federal government: "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter." 44 U.S.C. § 2202; SMF ¶ 12.

Under the PRA, at the end of a presidential administration, the Archivist of the United States, *i.e.*, the National Archives and Records Administration (NARA),[1] is required to "assume responsibility for the custody, control, and preservation" of Presidential records and "make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." 44 U.S.C. § 2203; SMF ¶ 13. A president can designate his Presidential records as restricted for up to 12 years. 44 U.S.C. § 2204. This designation does not eliminate all access to the records, however. During the restricted period, courts, Congress, and the incumbent President may request special access to the Presidential records. *Id.* §§ 2205(2)(A)-(C).

E-mail and other electronic messages, including electronic messages sent and received on non-official electronic message accounts, constitute Presidential records to the same extent as hard copy documents. 44 U.S.C. §§ 2201, 2209; SMF ¶ 9. The PRA provides explicit direction regarding the proper handling of Presidential Records sent using non-official electronic accounts: It requires the President, the Vice President, and Covered Employees[2] to "cop[y] their "official electronic messaging

[1] A reference to an agency head acting in an official capacity is equivalent to a reference to the agency. *See, e.g., Loeffler v. Frank*, 486 U.S. 549, 562 n. 8 (1988) ("Whenever the head of the Postal Service acts in his official capacity, he is acting in the name of the Postal Service.").

[2] For purposes of section 2209, "covered employee" means the immediate staff of the President or the Vice President, "a unit or individual of the Executive Office of the President whose function is

account" when sending a communication using a non-official account or to "forward[] a complete copy" of an email sent on their non-official account to their "official electronic messaging account . . . not later than 20 days after the original creation or transmission" of the record. 44 U.S.C. §§ 2209(a)(1), (a)(2); SMF ¶ 10.

Although not separately addressed, outgoing emails from non-official accounts are covered by the PRA whenever they "relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). That is, Presidential records received on a non-official account do not lose their status as Presidential records merely because they exist on a non-official electronic account. *See id.* § 2201 (defining Presidential records). And like all other Presidential records, they are the property of the United States, *id.* § 2202, and are required to be turned over to NARA no later than the end of the administration, *id.* § 2203.

## II.     Factual Background

Dr. Navarro began employment at the White House on January 20, 2017. SMF ¶¶ 1-2. He was appointed by then-President Donald Trump to serve as Assistant to the President, Director of Trade and Industrial Policy, and the inaugural head of the White House National Trade Council, a position he held through April 2017. *Id.* (citing Press Release—President-Elect Donald J. Trump Appoints Dr. Peter Navarro to Head the White House National Trade Council (Dec. 21, 2016), https://www.presidency.ucsb.edu/documents/press-release-president-elect-donald-j-trump-appoints-dr-peter-navarro-head-the-white). During this time, Dr. Navarro served as an advisor to then-President Trump and was employed within the White House Office, a unit of the Executive Office of the President that exists to advise or assist the President. SMF ¶¶ 3-4.

Dr. Navarro was subject to the PRA from the date of his appointment. In February 2017, the White House Counsel's Office issued a memorandum to White House personnel regarding the use of non-official email accounts to conduct official business, which outlined the obligations of White

---

to advise and assist the President," or "a unit or individual in the Office of the Vice President whose function is to advise and assist the Vice President." 44 U.S.C. § 2209(c)(1).

House personnel under the PRA. The memorandum read, in part: "If you ever send or receive email that qualifies as a [P]residential record using any other account [i.e., other than the official government account], you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days." SMF ¶ 11 (citing Compl. Ex. 1 at 2, ECF No. 1-2 (Memorandum for All Personnel, from Deputy White House Counsel Stefan C. Passantino, through Counsel to the President Donald F. McGahn (Feb. 22, 2017)) (WHCO Memorandum)). The memorandum also confirmed "that [P]residential records are the property of the United States . . . When you leave EOP employment, you may not take any presidential records with you." *Id.* at 2.

In April 2017, Dr. Navarro was appointed to serve as the Director of the Office of Trade and Manufacturing Policy (OTMP). SMF ¶ 3 (citing Trump White House Archives, Peter Navarro profile, https://trumpwhitehouse.archives.gov/people/peter-navarro/). "[I]n his role as Director of OTMP, Dr. Navarro advise[d] the President on policies to increase economic growth, decrease the trade deficit, and strengthen Americas' manufacturing and defense industrial bases." *Id.* The Office of Trade and Manufacturing Policy existed within the White House Office. SMF ¶ 4 (citing Presidential Executive Order on Establishment of Office of Trade and Manufacturing Policy (Apr. 29, 2017), https://trumpwhitehouse.archives.gov/presidential-actions/presidential-executive-order-establishment-office-trade-manufacturing-policy/).

In March 2020, Defendant assumed an additional title: President Trump appointed Dr. Navarro as the Defense Production Act Policy Coordinator, to coordinate the government's use of the Defense Production Act, 50 U.S.C. § 4501 *et seq.*, to ensure the production, by the private sector, of the items needed to respond to the COVID-19 pandemic. SMF ¶ 5 (citing Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing (Mar. 28, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-13/).

While serving as a presidential advisor, Defendant used at least one non-official email account, namely a ProtonMail account,[3] to send and receive messages in the course of discharging his official duties. SMF ¶ 14. Certain of these messages were obtained by the House Select Subcommittee on the Coronavirus Crisis (the Subcommittee) as part of its investigation into the government's response to the coronavirus pandemic. SMF ¶ 14 (citing Select Subcommittee on the Coronavirus Crisis, Select Subcommittee Releases New Evidence Of Trump Administration Failure To Heed Early Pandemic Warnings: New Documents Show that Peter Navarro and other Trump Administration Advisors Used Private Email Accounts to Communicate about Pandemic Response (Sept. 14, 2021), https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/9.14.21%20Navarro%20Document%20Release.pdf). Messages released publicly by the Subcommittee demonstrate that Dr. Navarro used the ProtonMail account to send and receive messages as part of the discharge of his duties to assist the President. *See* SMF ¶ 14 (citing Compl. Ex. 2, ECF 1-3)). The messages address topics such as the need for ventilators, the creation and deployment of National-Guard based rapid response teams, and the use of hydroxychloroquine to treat COVID. *See* Compl. Ex. 2.

Through the Subcommittee's work, NARA became aware of Dr. Navarro's use of a non-official email account to send and receive emails in the course of conducting official business. NARA concluded that these emails were Presidential records. *See* Compl. Ex. 3 at 1, ECF No. 1-4 (Dec. 16, 2021 Letter from Gary M. Stern, General Counsel, NARA, to Navarro (Stern Letter)). NARA's General Counsel, Gary Stern, wrote a letter to Dr. Navarro, explaining that NARA had "conducted a search of the White House emails that [it] received at the end of the Trump Administration and ha[d] no record" of Dr. Navarro forwarding to his official account any emails he received on his ProtonMail account. *Id.*; *accord* Compl. Ex. 4 at 1, ECF No. 1-5 (Declaration of William J. Bosanko ¶ 5, ECF No. 1-5 (Bosanko Decl.)). Mr. Stern noted that, "[t]here are also multiple instances where you sent emails from your personal account to other White House employees but did not copy or forward them to

[3] ProtonMail is provided by Proton AG (Proton), which is based in Switzerland. *See* https://proton.me/privacy. According to Proton, ProtonMail employs end-to-end encryption, meaning that not even Proton can decrypt the content of the messages of its users. *Id.*

your official account." Stern Letter at 1. After recounting the White House's reminders to its employees about their obligations under the PRA in the WHCO Memorandum, the letter stated that "it is necessary that you now provide NARA with any Presidential records that reside on your personal electronic messaging accounts." *Id.* at 2. Mr. Stern closed the letter by offering to work with Dr. Navarro to facilitate the transfer of Presidential records to NARA. *Id.* Dr. Navarro did not respond to the Stern Letter. Bosanko Decl. ¶ 6. Nor did Dr. Navarro respond to multiple voice messages that Mr. Stern left for him regarding the matter. *Id.*

Following up on NARA's letter, on June 1, 2022, Department of Justice counsel wrote Dr. Navarro a letter in an effort to secure the return of the Presidential records without litigation. Compl. Ex. 5, ECF No. 1-6 (June 1, 2022 Letter from Elizabeth J. Shapiro, Deputy Director, Federal Programs Branch, Civil Division, U.S. Department of Justice, to Navarro (Shapiro Letter)). The letter was emailed to Dr. Navarro, and sent to him via Priority Mail, through the U.S. Postal Service, with delivery completed on June 2, 2022.

The letter states, in relevant part:

> Since determining that you conducted official government business as an advisor to President Trump using a private email account, the National Archives and Records Administration (NARA) has repeatedly requested that you provide all electronic mail messages related to your official duties that you created or received using a private email account. To date, you have declined to provide the records.
>
> The Presidential Records Act, 44 U.S.C. § 2201 et seq., establishes that the United States owns records related to the President's official duties, whether or not the records were created or stored on an official government server. The United States is entitled to recover property that belongs to it, including official government records.
>
> We have been authorized to file a civil action against you in United States District Court to pursue claims for the recovery of wrongfully withheld records. We intend to file the action on or about June 21, 2022. But as is our practice in civil actions of this nature, we are willing to give you an opportunity to resolve this matter without litigation by turning the wrongfully withheld records over to NARA prior to June 21.

*See id.*

On June 16, 2022, counsel for Dr. Navarro contacted the Department of Justice and represented that they had retained a document review and analysis firm to aid them in evaluating the extent to which Dr. Navarro had PRA records in his possession, custody, or control. Bosanko Decl. ¶ 8. Over the next several weeks, Dr. Navarro's counsel provided periodic updates on the status of their search and analysis process. In order to assist and expedite the search, on July 18, 2022, NARA's General Counsel provided Dr. Navarro's counsel with a list of search terms. NARA requested that Dr. Navarro prioritize the return of any PRA records responsive to those search terms. *Id.*

By email dated July 22, 2022, Dr. Navarro's counsel represented that their application of the search parameters that NARA provided had generated over 1,700 documents. Thereafter, on July 25, 2022, Dr. Navarro's counsel estimated that, based on their review of these documents, between 200 and 250 of these 1,700 documents were PRA records. Bosanko Decl. ¶ 9.

By letter dated July 29, 2022, Dr. Navarro's counsel refused to produce any PRA records to NARA absent a grant of immunity for the act of returning such records. Bosanko Decl. ¶ 9.

On August 3, 2022, Plaintiff filed its complaint. *See* Compl., ECF No. 1. Through this complaint, Plaintiff seeks primarily to recover the Presidential records in Plaintiffs' possession. *See id.* ¶ 43 ("[T]he primary interest of the United States is in recovering the records and preserving them as required by statute . . . .). The complaint contains two claims for relief, one under D.C. law, and the other under federal common law under the PRA. *Id.* ¶¶ 39-50. Both claims seek the return of Presidential records that belong to the United States and that have been wrongfully detained by the Defendant. *Id.*

Because there is no genuine dispute that Defendant has unlawfully retained and withheld Presidential records that are rightly the property of the United States, this motion seeks summary judgment and a writ of replevin from this Court ordering Defendant to return all Presidential records in his possession to the United States.

## ARGUMENT

### The United States is Entitled to a Writ of Replevin for the Return of Presidential Records Belonging to the United States and Held Illegally by the Defendant

There can be no genuine dispute that Dr. Navarro has wrongfully detained Presidential records, which, by statute, belong to the United States. *See supra* pages 3-7. Dr. Navarro served as an advisor to the President within the Executive Office of the President from January 20, 2017, until January 20, 2021; accordingly, any records "created or received" by Dr. Navarro during that time "in the course of conducting activities which relate to or have an effect upon the carrying out of the . . . duties of the President" are Presidential records, 22 U.S.C. § 2201(2), which belong to the United States, *id.* § 2202. Such records include emails and other electronic records sent from Dr. Navarro's non-official ProtonMail email account. *Id.* §§ 2201, 2209. The record in this case demonstrates beyond dispute that Dr. Navarro used his ProtonMail account to send and receive messages constituting Presidential records. SMF ¶ 14 (citing ECF No. 1-3; Bosanko Decl. ¶ 6). Indeed, on July 25, 2022, Dr. Navarro's own counsel estimated that Dr. Navarro was in possession of at least 200 to 250 Presidential records (based only on underinclusive search terms). SMF ¶ 16 (citing Bosanko Decl. ¶¶ 6-10). And the record further shows that Dr. Navarro did not copy or forward to his official email account on each email or message constituting a Presidential record that was sent or received on his non-official email account. SMF ¶ 15 (citing Bosanko Decl. ¶ 5). By Defendant's own admission, then, Dr. Navarro is holding property that rightfully belongs to the United States. Because such records belong to the United States, and because Dr. Navarro has not turned these records over to the United States, it is beyond dispute that Dr. Navarro has wrongfully withheld property of the United States in the form of Presidential records.

As the foregoing discussion makes clear, there is no genuine dispute of material fact (i) that Dr. Navarro was subject the PRA; (ii) that PRA records are the property of the United States; and (iii) that Dr. Navarro has refused to return those records to the United States. Under D.C. law, the United States is entitled to recovery of its property. Alternatively, to the extent that federal law controls, the

United States is entitled to recover its property as a matter of federal common law. Either way, the Court should issue a writ of replevin directing Defendant to return the government's property.

Replevin "is, in general, an action in which the owner, or a person who has a general or special interest in some personalty either taken or detained by another, seeks to recover possession in specie, and, occasionally, the recovery of damages as an incident of the proceedings." Replevin, 7 American Law of Torts § 24:17. Federal Rule of Civil Procedure 64 specifically contemplates that federal courts will issue writs of replevin, specifying that the law of a forum state will govern except insofar as federal law applies. Here, there is authority under the law of the District of Columbia and under federal common law for issuance of a writ of replevin.

D.C. law creates an action for replevin, allowing a Plaintiff "to recover personal property to which the plaintiff is entitled, that . . . [has] been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant." D.C. Code 16-3701.[4] The "essence" of a replevin action under D.C. law is the "wrongful withholding of the property in question." *Hunt v. DePuy Orthopaedics, Inc.*, 729 F. Supp. 2d 231, 232 (D.D.C. 2010) (cleaned up). Where, as here, a party has wrongfully detained property belonging to the United States, the United States has sued for the return of the property. *See United States v. Zook*, 12-cv-1465 (D. Md.) (seeking return of a handwritten pardon drafted by President Lincoln); *United States v. McElvenny*, 02-cv-3027 (S.D.N.Y.) (seeking a map of Cuba bearing notations made by President Kennedy during the Cuban Missile Crisis and a collection of President Kennedy's papers regarding federal involvement in the integration of the University of Mississippi).

In the alternative, Count II of the complaint states a claim for replevin under federal common law. Federal common law is available in cases where there is a "uniquely federal interest" and "a significant conflict exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." *Boyle v.*

[4] Personal property here means movable property, as opposed to real property. *See* 77 Corpus Juris Secondum, Replevin § 8 ("Replevin is only for the recovery of personal property, and it may not be maintained to recover real property.").

*United Techs. Corp.*, 487 U.S. 500, 507 (1988) (cleaned up). The treatment and preservation of Presidential records plainly involves a uniquely federal interest. As explained above, the PRA makes clear that the United States "shall reserve and retain complete ownership, possession, and control of Presidential records," and that such records "shall be administered in accordance with the provisions of" the PRA, 42 U.S.C. § 2202, which sets out the standards for management and custody of Presidential records, *id.* § 2203. Because the federal government is the rightful owner of these records, litigation regarding their recovery implicates an area of uniquely federal interest. *See* 17A Moore's Federal Practice – Civil § 120.31 (2022) (noting that federal common law has been developed and applied in "[c]ases involving federal proprietary interests"); *cf. Boyle*, 487 U.S. at 506 (holding that the "procurement of equipment by the United States is an area of uniquely federal interest"). Further, if the D.C. replevin statute does not provide an opportunity for the United States to recover the records at issue, this would "frustrate specific objectives" of the PRA—namely the retention and preservation of documents with historical significance—thus authorizing the application of Federal common law. Defendant's return of all Presidential records in his possession is an essential prerequisite for NARA to fulfill its statutory obligations under the PRA. In addition to "maintain[ing] and preserv[ing] Presidential records," the PRA requires NARA to "make [Presidential] records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." 44 U.S.C. § 2203(g)(1). Return of the Presidential records to NARA accords with the PRA, as NARA obviously cannot "make available" records that it does not have. Courts exercising federal common law in such circumstances ordinarily do so by adopting state law. *See, e.g.*, *Harrell v. United States*, 13 F.3d 232, 235 (7th Cir. 1993) (citing *Powers v. U.S. Postal Ser.*, 671 F.2d 1041, 1043-44 (7th Cir. 1982)). In doing so, however, courts are not bound by rules of state law that would be inconsistent with the goals of the underlying federal statute; otherwise, federal common law would perpetuate the exact problem that it is intended to solve. *Id.* Thus, in the event that the D.C. replevin statute does not permit the recovery of the records at issue, federal common law would provide another basis for issuing a writ of replevin that is not so constrained.

This Court need not resolve whether District or federal law governs here, because the essence of both claims is the same—when a plaintiff files suit to recover personal property that has wrongfully been detained, the plaintiff is entitled to a writ of replevin. Whether framed under the District's replevin statute or under federal common law, the requirements for issuance of a writ of replevin are satisfied here.

**CONCLUSION**

Consistent with the PRA, Plaintiff respectfully requests that this Court grant Plaintiff's motion for summary judgment and issue a writ of replevin ordering Defendant to return to the United States all Presidential records in Defendant's possession, custody, or control.

Dated: September 26, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director
Federal Programs Branch

/s/ *Lee Reeves*
LEE REEVES
ALEXANDRA SASLAW
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 616-0773
Email: lee.reeves2@usdoj.gov

*Counsel for Plaintiff*