**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

*Plaintiff*,

–v.–

PETER K. NAVARRO,

*Defendant*.

Case No. 1:22-cv-2292

**PLAINTIFF'S COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT & OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

ARGUMENT.......................................................................................................................2

I.     There Are No Genuine Disputes of Material Fact..............................................2

II.    The United States Is Legally Entitled to the Return of Presidential Records..............................4

    A.    Dr. Navarro's legal arguments regarding his responsibilities under the PRA are irrelevant to this case..........................................................4

    B.    Dr. Navarro's legal arguments regarding his responsibilities under the PRA are also incorrect. ........................................................5

    C.    The PRA does not permit Dr. Navarro to hold onto Presidential records indefinitely...........................................................8

    D.    Replevin is a proper action for the recovery of wrongfully withheld Presidential records...........................................................10

    E.    To the extent that the D.C. replevin statute would not permit the recovery of the records, federal common law is available as an alternative............................15

III.   Defendant's Act of Production Privilege Assertion is Meritless.........................................16

    A.    Dr. Navarro fails to carry his burden to establish the requisite elements of the privilege. ..........................................................17

    B.    On the merits, Dr. Navarro's claim of privilege fails...........................................18

CONCLUSION...................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Bush,*
    924 F.2d 282 (D.C. Cir. 1991)............................................................................................20

*Armstrong v. Exec. Office of the President,*
    1 F.3d 1274 (D.C. Cir. 1993) ............................................................................................11

*Baltimore City Dep't of Social Servs. v. Bouknight,*
    493 U.S. 549 (1990) ..........................................................................................................20

*Bayview Loan Servicing, LLC v. McNaughton,*
    No. 2:05-cv-254, 2007 WL 2433996 (W.D. Mich. 2007)..................................................17

*BMO Harris Bank N.A. v. Dist. Logistics, LLC,*
    No. 20-cv-03425, 2021 WL 7448012 (D.D.C. 2021) ........................................................13

*Bordelon v. Chicago Sch. Reform Bd. of Trustees,*
    233 F.3d 524 (7th Cir. 2000) ..............................................................................................3

*Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988) ..........................................................................................................15

*Chefs Diet Acquisition Corp. v. Lean Chefs, LLC,*
    No. 14-cv-8467, 2016 WL 5416498 (S.D.N.Y. 2016)......................................................12

*Curcio v. United States,*
    354 U.S. 118 (1957) ..........................................................................................................18

*Ficken v. AMR Corp.,*
    578 F. Supp. 2d 134 (D.D.C. 2008).............................................................................11, 12

*Fisher v. United States,*
    425 U.S. 391 (1976) ....................................................................................................16, 17

*Grosso v. United States,*
    390 U.S. 62 (1968)............................................................................................................20

*Hinson ex rel. N.H. v. Merritt Educ. Ctr.,*
    579 F. Supp. 2d 89 (D.D.C. 2008)......................................................................................3

*Hoffman v. United States,*
    341 U.S. 479 (1951) ..........................................................................................................17

*Hopkins v. West,*
    229 P.3d 560 (Okl. Civ. App. 2009) ................................................................................14

*In re Grand Jury Subpoena Dated Feb. 2, 2012*
   741 F.3d 339 (2d Cir. 2013) ........................................................................................................20

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*
   670 F.3d 1335 (11th Cir. 2012) ...........................................................................................18, 19

*In re Grand Jury Subpoena Duces Tecum Dated October 29, 1992*
   1 F.3d 87 (2d Cir. 1993) ............................................................................................................19

*In re Grand Jury Subpoena,*
   973 F.2d 45 (1st Cir. 1992) .......................................................................................................17

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.,*
   845 F. Supp. 2d 288 (D.D.C. 2012) .........................................................................................10

*Nixon v. United States,*
   978 F.2d 1269 (D.C. Cir. 1992) ..........................................................................................11, 15

*SEIU Healthcare Nw. Training P'ship v. Evergreen Freedom Found.,*
   427 P.3d 688 (Wash. Ct. App. 2018) ........................................................................................12

*Shapiro v. United States,*
   335 U.S. 1 (1948) ......................................................................................................................20

*United States v. Dean,*
   23 F. App'x 448 (6th Cir. 2001) ...............................................................................................18

*United States v. Fridman,*
   974 F.3d 163 (2d Cir. 2020) ...............................................................................................16, 18

*United States v. Greenfield,*
   831 F. 3d 106 (2d Cir. 2016) ....................................................................................................19

*United States v. Hubbell,*
   530 U.S. 27 (2000) ....................................................................................................................17

*United States v. McElvenny,*
   No. 02-cv-3027 (S.D.N.Y. 2002) .........................................................................................10, 11

*United States v. Zook,*
   No. 1:12-cv-01465 (D. Md. 2012) ............................................................................................10

## Statutes

44 U.S.C. § 2201(2) ............................................................................................................. 4, 6

44 U.S.C. § 2202 ............................................................................................................5, 11, 20

44 U.S.C. § 2203 ..................................................................................................................6, 20

44 U.S.C. § 2209 ................................................................................................6, 7, 8

D.C. Code § 16-3701............................................................................................5, 10

D.C. Code § 16–3702............................................................................................12, 13

## Rules

D.D.C. Local Civil Rule 7(h) ...........................................................................................2

Fed. R. Civ. P. 56(a).......................................................................................................2

## Legislative Materials

H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. 2 (1978)................................................20

## Other Authorities

66 Am. Jur. 2d Replevin § 1 .........................................................................................13

66 Am. Jur. 2d Replevin § 6.........................................................................................12

Black's Law Dictionary (11th ed. 2019) .......................................................................11, 13

U.S. Dep't of Justice, *Government Announces Settlement Over Nixon Presidential Papers* (June 12, 2000), https://www.justice.gov/archive/opa/pr/2000/June/336civ.htm .......................................................15

**INTRODUCTION**

In its Motion for Summary Judgment, the Government argued that Defendant Peter J. Navarro failed to comply with his obligations under the Presidential Records Act (PRA) and that he continues to retain an unknown number of "Presidential records" that belong to the United States. Dr. Navarro does not dispute the core facts underlying the Government's motion. Indeed, Dr. Navarro acknowledges in his opposition that Presidential records belong to the United States, that he served as a Presidential advisor subject to the PRA, that he used at least one non-governmental email account to send and receive messages constituting Presidential records, and that he failed to preserve such emails by forwarding or copying them to his official government email account. And although Dr. Navarro claims that he is unaware of the extent of the Presidential records in his possession, he notably does not deny that he possesses at least certain Presidential records that he has not returned to the United States.

The only disputes are of a legal nature. Dr. Navarro contends that the PRA imposed no duties on him and that the PRA does not entitle the Government to file an action to recover documents. But regardless of whether the PRA imposed specific duties on Dr. Navarro (which it did), it is undisputed that the PRA vests complete ownership, possession, and control of Presidential records in the United States, and thus that any Presidential records in Dr. Navarro's possession belong to the United States. Replevin provides the mechanism for recovering this wrongfully withheld property.

Dr. Navarro further argues that even if he must return the Presidential records in his possession, he need not do so for the foreseeable future because the act of returning such records would constitute self-incrimination in violation of the Fifth Amendment. But Dr. Navarro has not met his burden to demonstrate why producing Presidential records would incriminate him. It would not incriminate Dr. Navarro to confirm that he has Presidential records, not least because he has already admitted that he possesses them. Even were that not the case, the Fifth Amendment does not apply to records that are "vested with a public character" and are required to be maintained by law.

None of the Defendant's arguments defeats the core of the Government's complaint—that Dr. Navarro has wrongfully retained Presidential records that belong to the United States and that the United States is entitled to the return of such records. Accordingly, the Court should reject Dr. Navarro's continued efforts to evade his PRA responsibilities; deny Defendant's Motion to Dismiss; grant the Government's Motion for Summary Judgment; issue a writ of replevin; and order the return of all Presidential records in Dr. Navarro's possession to the United States.

## ARGUMENT

### I.   There Are No Genuine Disputes of Material Fact.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1] Here, there are no material facts in dispute, so the case can be decided as a matter of law. Indeed, shortly after Dr. Navarro filed his Motion to Dismiss, the Court observed that "it appears that the dispute between the parties is purely legal in nature," and Dr. Navarro's subsequent filings confirm that view. Oct. 12, 2022 Minute Order.

The Government's Statement of Material Facts Not in Dispute, ECF No. 7-2 ("SMF") contained sixteen proposed factual statements, twelve of which Dr. Navarro expressly does not dispute. *See* Def.'s Resp. to the Government's Statement of Undisputed Material Facts ¶¶ 1-8, 10, 12-14, ECF No. 11-1 ("SMF Resp."). Of the remaining four, Dr. Navarro provided what amounts to legal objections and quasi-admissions, rather than a claim that a genuine factual dispute exists. SMF Resp. ¶¶ 9, 11, 15-16. In response to certain proposed statements, Dr. Navarro appears to challenge the legal significance of the underlying facts but does not deny those facts. *See, e.g.*, SMF Resp. ¶ 11 (responding to Government's statement that the White House Counsel's Office issued a memorandum containing

---

[1] D.D.C. Local Civil Rule 7(h) requires that each party submitting a motion for summary judgment attach a statement of material facts to which that party contends there is no genuine issue, with specific citations to those portions of the record upon which the party relies in fashioning the statement. *See* LCvR 7(h). As Dr. Navarro correctly concedes, the party opposing such a motion must, in turn, provide "specific facts showing that there is a genuine issue for trial." Def.'s Opp. to the United States' Mot. for S.J. 4, ECF No. 11 ("SJ Opp"); *accord* LCvR 7(h). Where the opposing party fails to discharge this obligation, a court may take all facts alleged by the movant as admitted. *See* LCvR 7(h).

certain language by claiming a dispute "only to the extent that the memorandum interprets the law more broadly than the language of 44 U.S.C. 2209(a)"). In others, Dr. Navarro appears to challenge what constitutes a Presidential record, but that is a question of law. *See, e.g.*, SMF Resp. ¶¶ 9, 15

In response to the Government's statement that "Defendant continues to have Presidential records in his possession, custody, and/or control," Dr. Navarro attempts to evade the question and introduce ambiguity, but his assertions are wholly unsupported by the record. *See* SMF Resp. ¶ 16. But even in that instance, Dr. Navarro does not identify a material dispute of fact. Indeed, Dr. Navarro does not deny that he has *at least some* Presidential records in his possession, custody, or control, nor could he in light of his counsel's prior representations. *See* Compl., Ex. 4, Decl. of William J. Bosanko ¶ 9, ECF No. 1-5 ("Bosanko Decl.") (referencing representations of Dr. Navarro's counsel stating that initial searches for PRA material had generated over 1,700 potentially responsive documents and estimating that between 200 to 250 of those documents were Presidential records); *see also* SMF Resp. ¶ 14 (not disputing the Government's statement that "[w]hile serving in the White House, Defendant used at least one non-official email account . . . to send and receive messages constituting Presidential records"). And although Dr. Navarro equivocates as to "*the extent* of whether or what Presidential records are in his possession, custody, and/or control," the core fact that he has retained at least some number of Presidential records is undisputed. SMF Resp. ¶ 16 (emphasis added). In any event, if Dr. Navarro somehow intended to dispute that he has any Presidential records in his possession, custody, and/or control, he failed to cite any evidence in the record that would support that claim. As such, Dr. Navarro has not identified any factual dispute that would preclude summary judgment in this case. *See Hinson ex rel. N.H. v. Merritt Educ. Ctr.*, 579 F. Supp. 2d 89, 91 (D.D.C. 2008) (Kollar-Kotelly, J.) (holding that "so-called 'factual assertions' that are unsupported by citations to accurate record evidence are insufficient to create issues of material fact"); *accord Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 529 (7th Cir. 2000) (A district court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact.").

II.    **The United States Is Legally Entitled to the Return of Presidential Records.**

Dr. Navarro raises a variety of legal arguments regarding the scope and applicability of the PRA, replevin, and federal common law, but none is persuasive. Moreover, none of Dr. Navarro's arguments overcomes the basic fact that any Presidential records in his possession belong to, and must be returned to, the United States.

A.   **Dr. Navarro's legal arguments regarding his responsibilities under the PRA are irrelevant to this case.**

Dr. Navarro spends a substantial portion of his opposition and motion to dismiss arguing that the PRA does not impose an express statutory obligation on him to return Presidential records that he created or received during his tenure as a Presidential advisor and that the PRA does not contain its own enforcement mechanism. *See* Def.'s Opp'n to United States' Mot. for Summ. J. 4-5, ECF No. 11 ("SJ Opp'n"); Def.'s Mot. to Dismiss 7, ECF No. 9 ("MTD"). Dr. Navarro further argues that the PRA lacks any statutory deadline by which he must turn over any Presidential records in his possession, and thus the Government has no legal recourse. SJ Opp'n 5; MTD 5.

But these arguments miss the point. This replevin action is not about whether Dr. Navarro had a specific statutory duty under the PRA and whether he complied with it. Rather, it is about whether the United States is entitled to recover property (in the form of Presidential records) whose ownership is clearly established by the PRA, through a writ of replevin.

As explained in the Government's opening brief, it is beyond dispute that Dr. Navarro currently possesses Presidential records and that these records belong to the United States. *See* Pl.'s Mem. in Support of Mot. for Summ. J. 3-7, ECF No. 7-1 ("SJ Mem."). Under the PRA, "Presidential records" include:

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2); *see also* SMF Resp. ¶ 8 (not disputing this definition). This definition plainly encompasses emails and other electronic records sent or received by Dr. Navarro, including those sent

or received on his non-official email account. And the PRA is clear that the United States "retain[s] complete ownership, possession, and control of Presidential records[.]" 44 U.S.C. § 2202; *see also* SMF Resp. ¶ 12 (not disputing this statement). Under the PRA, the United States owns such records from the moment of their creation or receipt.[2]

A writ of replevin—whether issued under D.C. law or federal common law—provides a mechanism for the recovery of personal property that "is alleged to have been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant." D.C. Code § 16-3701; *see also* SJ Mot. 9-11. That the PRA does not contain a separate, express cause of action is therefore irrelevant. The PRA unambiguously establishes that the United States is the rightful owner of the Presidential records that Dr. Navarro admittedly possesses, and under the D.C. replevin statute the United States is entitled to their return.

That simple fact renders most of Dr. Navarro's legal arguments wholly irrelevant, regardless of Dr. Navarro's individual obligations under the PRA, and regardless of whether he complied with them while serving in the White House (which he did not). The United States is not seeking to punish Dr. Navarro's non-compliance with the PRA; it is seeking the return of its wrongfully withheld property through a writ of replevin.

## B. Dr. Navarro's legal arguments regarding his responsibilities under the PRA are also incorrect.

In addition to being legally irrelevant, Dr. Navarro's legal arguments regarding the PRA are

---

[2] Dr. Navarro seems to challenge this basic principle in his Motion to Dismiss, but his argument is premised on a misrepresentation of the Government's position in this litigation. Specifically, Dr. Navarro argues that the Complaint in this action "alleges that Dr. Navarro was the proper recipient or creator of these records at the time they were created," and suggests that he was only unlawfully in possession of such records once "the United States . . . identified them as being emails which Dr. Navarro must turn[] over." MTD 10. But the Complaint in this action is clear that any records generated or received by Dr. Navarro in the course of assisting with the discharge of the President's official duties—including those created or received on non-official email accounts—are, and always have been, Presidential records, and that the United States "retain[s] complete ownership, possession, and control of Presidential records." Compl. ¶¶ 3-4, ECF No. 1 (quoting 44 U.S.C. § 2202). Thus, far from alleging that Dr. Navarro possessed or owned Presidential records at the time of their creation, the Government has consistently maintained that such records have belonged to the United States since their creation.

factually incorrect. Contrary to Dr. Navarro's claim that his statutory duties under the PRA are "basically nonexistent," SJ Opp'n 5, the PRA is clear that Presidential advisors like Dr. Navarro have an obligation to preserve Presidential records during their tenure so that they can be transferred to NARA at the end of an administration. *See* 44 U.S.C. § 2203(g)(1) ("Upon the conclusion of a President's term in office . . . the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President.").

Indeed, the PRA contains several instructions for how Presidential records should be maintained during a President's tenure. *See, e.g.*, 44 U.S.C. § 2203(b) (requiring the categorization of documentary materials produced or received by Presidential advisors as Presidential records or personal records "upon their creation or receipt"). And 44 U.S.C. § 2209(a) states that a covered employee like Dr. Navarro:

> may not create or send a Presidential . . . record using a non-official electronic message account unless the President, Vice President, or covered employee (1) copies an official electronic messaging account . . . in the original creation or transmission of the Presidential record . . . ; or (2) forwards a complete copy of the Presidential . . . record to an official messaging account . . . not later than 20 days after the original creation or transmission of the Presidential . . . record.

44 U.S.C. § 2209(a)(1)-(2). And although section 2209(a) does not expressly impose such a duty with respect to Presidential records received—as opposed to sent—on a non-official email account, the PRA makes clear that such records are also Presidential records, which must be properly preserved and maintained. *See id.* § 2201(2) (defining Presidential records to include those "created or *received* by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President") (emphasis added); 44 U.S.C. § 2203(a)-(b).[3]

Dr. Navarro tries to evade this responsibility in several ways, but none is availing.

---

[3] Dr. Navarro does not dispute that a White House Counsel memorandum sent early in Dr. Navarro's tenure expressly extended section 2209(a)'s requirement to copy or forward emails to apply to those emails received on a non-official email account. *See* pages 5-6, *supra*. *See also* Compl. Ex. 1 at 2, ECF No. 1-2 (instructing White House personnel that "[i]f you ever send *or receive* email that qualifies as a presidential record using any other account . . . , you must preserve that email by copying it to your official EOP email account or by forwarding it to your official email account within twenty (20) days.") (emphasis added)).

First, Dr. Navarro suggests that the United States cannot rely on 44 U.S.C. § 2209 because it has not yet been interpreted by any court, *see* SJ Opp'n 5-7, but this argument has no merit.[4] Dr. Navarro cites no legal authority for the claim that a litigant cannot rely on a statute until it has been previously interpreted by another court. It is self-evident that any statute that has been interpreted by the courts must have been, at one time, "yet to be interpreted by the Courts." *Id.* at 6. That no court has yet had occasion to interpret section 2209 does not change the fact that it is the law, or that this Court is competent to interpret it in the first instance—particularly given that the statute's meaning is clear on its face.

Next, Dr. Navarro contends that section 2209 only applies to intentional violations of this requirement, and that the sole purpose of section 2209 is to authorize discipline against federal employees. SJ Opp'n 7. But that argument conflates section 2209(a), which sets out a general disclosure requirement for covered employees, with section 2209(b), which authorizes disciplinary action. *See* 44 U.S.C. § 2209(a)-(b). Moreover, as explained above, the issue in this case is not Dr. Navarro's failure to comply with the requirements of section 2209(a), but his wrongful possession of, and continued refusal to return, Presidential records to their rightful owner, the United States. For replevin purposes, his intent in detaining or retaining Presidential records is irrelevant.

Finally, Dr. Navarro argues that because he believes the statute to be "vague" or unsettled, "there exist genuine disputes of material fact as to whether any alleged actions Dr. Navarro engaged in were even a violation of the PRA." SJ Opp'n 7. But a question of statutory interpretation is a question of law, not a genuine dispute of material fact.

In any event, as explained above, Dr. Navarro's obligations under the PRA are largely beside the point. The question at issue in this replevin action is straightforward and unambiguous: Has Dr. Navarro retained Presidential records that belong to the United States?  The record in this case makes clear that he has such records, and that the United States is entitled to their return.

---

[4] Jurisprudence on the PRA is understandably sparse, as administrations have generally cooperated with White House lawyers, White House records professionals, and the Archivist to ensure compliance with the PRA since its enactment.

**C. The PRA does not permit Dr. Navarro to hold onto Presidential records indefinitely.**

Dr. Navarro's argument that the PRA lacks any statutory deadline for the return of records is similarly irrelevant and unavailing. As explained above, the Government need not point to any obligation for the return of Presidential records under the PRA, as the Government is not seeking their return under the PRA. Rather, replevin provides a mechanism for the recovery of the United States' wrongfully withheld property. *See* pages 4-5, *supra*. But even setting that aside, Dr. Navarro's argument proves too much.

As an initial matter, Dr. Navarro had no authority to remove Presidential records from the control of the White House in the first place. The PRA contemplates that Presidential records will be preserved throughout the course of an administration and turned over to NARA at the conclusion of such administration.[5]   Under the PRA, Presidential records—including those created or received on Dr. Navarro's personal account(s)—belong to the United States from the moment of their creation, and Dr. Navarro should have preserved those records at that time or shortly thereafter, and in all events prior to leaving government service. Dr. Navarro failed to comply with this requirement then, and continues to wrongfully withhold Presidential records now, even though nearly two years have passed since the end of the previous administration.

Having admittedly failed to comply with his preservation obligations under the PRA, Dr. Navarro exacerbates this omission by (1) retaining original Presidential records in his personal custody for which no copy is in the government's custody long after separating from the government; and (2) refusing repeated requests to return them to their rightful owner, the United States. Dr. Navarro now argues that the PRA does not provide a deadline by which records are to be provided to the Archivist. In essence, Dr. Navarro seeks to leverage one derogation of his statutory duty (his failure to preserve Presidential records during his tenure in the White House) to authorize another (his failure to return Presidential records to the Archivist). That simply cannot be reconciled with the PRA. Indeed, even

---

[5] The PRA also contains an express requirement that Presidential records sent from a non-official email account be preserved to an official recordkeeping system either at the time of their creation or within twenty days. *See* 44 U.S.C § 2209(a)(1). It is undisputed that Dr. Navarro failed to comply with this statutory timeframe. *See* SMF Resp. ¶ 15 (not disputing that Dr. Navarro did not copy or forward emails from his non-official email account to his official email account).

Dr. Navarro seems to concede that he must turn over Presidential records to the Archivist.[6] Despite his claim that no such deadline exists, he later argues that he has "asserted a privilege validly delaying the time within which he must produce the records sought by the Archivist."  SJ Opp'n 10; *see also* MTD 6.

Even if there were some period of time that the Government must wait before seeking to retrieve its wrongfully retained property—and there is not—that time has clearly elapsed. Although Dr. Navarro maligns the Government's efforts to compel his return of PRA material as "unnecessary" and "rushed," SJ Opp'n 4, the fact of the matter is that, almost two years after he left government service, and despite repeated requests, Dr. Navarro has yet to return a single Presidential record in his possession. Dr. Navarro's complaints are further belied by his uncooperativeness. Dr. Navarro ignored repeated efforts to contact him regarding the return of Presidential records dating as far back as December 2021, responding (via counsel) in June 2022, only after the Department of Justice informed him by certified letter that it had been authorized to file suit seeking the return of Presidential records that Dr. Navarro had unlawfully retained. *See* Bosanko Decl. ¶ 7 (referencing failed attempts to contact Dr. Navarro and Department of Justice pre-suit letter).  Hopeful that the parties could resolve their disagreement without litigation, the Department of Justice further refrained from filing suit at Dr. Navarro's request while he retained a document review firm to search his email and his attorneys reviewed potentially responsive documents for Presidential records. The Government ultimately filed suit in August 2022, only after Dr. Navarro refused to return any Presidential records absent a grant of act-of-production immunity. *See* Bosanko Decl., Attachment A. From that point forward, the

---

[6] Dr. Navarro contends that "he will turn over any Presidential records in his possession once the audit is complete and any risk that such a production serves to incriminate him has been alleviated." SJ Opp'n 5. But he offers no estimate of when that time might come, nor any justification for delay in providing records that he has no legal right to possess. Nor does he give any indication that he is currently working toward completing his purported audit. Instead, he has outright refused to produce records already identified as Presidential based on an inapplicable "act of production" privilege. *See* pages 16-20, *infra*. Dr. Navarro's assurance of future cooperation rings hollow, given his persistent refusal to returns the records, not to mention his pending motion to dismiss the Government's Complaint on the grounds that the United States has no legal right to recover records that it legally owns. *See generally* MTD & SJ Opp'n (both seeking the entry of judgment in Defendant's favor and dismissal of the case).

Government reasonably concluded that Dr. Navarro had no present intention of returning Presidential records and that legal action was therefore appropriate.

### D. Replevin is a proper action for the recovery of wrongfully withheld Presidential records.

As explained above and in the Government's opening brief, replevin authorizes a plaintiff "to recover personal property to which the plaintiff is entitled, that is alleged to have been wrongfully taken by or to be in the possession of and wrongfully detained by the defendant." D.C. Code § 16-3701. That is precisely the purpose of the instant lawsuit, and thus the Government has properly invoked the D.C. replevin statute.[7]

Dr. Navarro appears to suggest that a writ of replevin is not appropriate where the wrongful possession is the "result of an innocent oversight and therefore not willful," but he offers no legal support for that claim. SJ Opp'n 8. To begin and setting aside his claim—belied by the record—that his repeated failure to engage with NARA and return the wrongfully held records was "innocent" and "not willful," Dr. Navarro's mental state is irrelevant. As noted previously, the United States need not show that Dr. Navarro's taking or continued possession of Presidential records was willful or malicious. Rather, the Government need only show that the Presidential records are in the possession of and wrongfully detained by the defendant. Regardless of Dr. Navarro's intentions, his possession

---

[7] Dr. Navarro suggests that the Government improperly relied on "dicta" from *United States v. Zook*, and *United States v. McElvenny*, but Dr. Navarro misunderstands the Government's point. The Government cited these cases as examples of cases "[w]here, as here, a party has wrongfully detained property belonging to the United States [and] the United States has sued for the return of the property." SJ Mem. 9; *see also* Compl. ¶ 1, ECF No. 1, *United States v. Zook*, No. 1:12-cv-01465 (D. Md. May 15, 2012) ("This is a civil action for declaratory judgment and ancillary relief, both to declare that a historic pardon . . . is a record belonging to the United States and to order Defendant to return the same forthwith to the possession of the United States by surrender to the National Archives."); *see also* Mem. of Law in Support of the Application of the United States of America for a Temporary Restraining Order & a Preliminary Injunction, and For Related Relief at 19, ECF No. 6, *United States v. McElvenny*, No. 02-cv-3027 (S.D.N.Y. Apr. 22, 2002) (arguing that "[t]he validity of the Government's right to the Map and the Meredith Documents is governed by New York replevin law"). In each of these cases, the courts never had occasion to decide whether replevin was a proper cause of action—one case appears to have been resolved informally and the other resulted in judgment on the pleadings after the defendant failed to dispute the allegations in the Government's complaint. *See* Order, ECF No. 10, *United States v. Zook*, No. 1:12-cv-01465 (D. Md. Aug. 16, 2012). The United States District Court for the District of Columbia has cited *McElvenny* as an example of the government initiating legal action to recover wrongfully withheld Presidential records. *See Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 845 F. Supp. 2d 288, 302 (D.D.C. 2012).

of Presidential records belonging to the United States is "wrongful," insofar as he is not the owner of those records and has resisted the United States' efforts to secure the return of its property. An individual may wrongfully possess something even if he does so unintentionally. *See Wrongful*, Black's Law Dictionary (11th ed. 2019) (defining "wrongful" to include "contrary to law" or "unlawful").

Of course, even if Dr. Navarro's initial taking and retention of Presidential records was unintentional, he has been aware of this purported "oversight" since at least December 2021. Yet, he has refused to return a single Presidential record to the United States. Dr. Navarro's continued retention of Presidential records at this point is plainly willful.

Dr. Navarro further argues that Presidential records are not subject to replevin law because they are not personal property, but that argument also fails. "Personal property" is the complement to "real property," and it is well-established that personal property encompasses "[a]ny moveable or intangible thing that is subject to ownership and not classified as real property." *Property*, Black's Law Dictionary (11th ed. 2019).

Presidential records plainly fall into this broad definition, whether they are physical objects (like the map sought in *United States v. McElvenny*) or electronic records (like the emails sought in this case).[8] Dr. Navarro's sole support for his argument to the contrary is a district court case finding that airline frequent flyer miles are not personal property, *see* SJ Opp'n 8 (citing *Ficken v. AMR Corp.*, 578 F. Supp. 2d 134, 143 (D.D.C. 2008)); MTD 9-10 (same). But frequent flyer miles are readily distinguishable from Presidential records. In *Ficken*, the court found that frequent flyer miles "amounted to credit with the airline" and thus represented an "intangible right" rather than "personal property." 578 F. Supp. 2d at 143. Presidential records, by contrast, are not credits issued by a third-party, but personal property

---

[8] In *Nixon v. United States,* the D.C. Circuit —prior to the enactment of the PRA—held that presidential materials were the President's personal property. 978 F.2d 1269, 1284 (D.C. Cir. 1992). Of course, the passage of the PRA in 1978 changed the ownership of Presidential records—instead of the personal property of the president, they became the personal property of the United States. *See* 44 U.S.C. § 2202. But this change in ownership did not change their fundamental character as personal property. While the records at issue in *Nixon* were analog in nature, there is no question that under *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1283 (D.C. Cir. 1993), emails are records under the Presidential Records Act (as well as the Federal Records Act), and therefore constitute personal property.

wholly owned by the United States. To the extent that Dr. Navarro intends to suggest that the records sought here are not personal property solely because they exist in electronic rather than physical format, that is a distinction without a difference. D.C.'s replevin statute applies to all personal property, with no distinction for whether that property exists in hard copy or an electronic database. *See* 66 Am. Jur. 2d Replevin § 6 ("Replevin is the proper remedy, in most jurisdictions, to recover the possession of every kind of personal property to which the plaintiff has a right to present or immediate possession. A replevin statute may not distinguish between tangible and intangible property."). Courts interpreting replevin statutes in other jurisdictions have found that electronically stored information constitutes personal property subject to a valid replevin action. *See, e.g., SEIU Healthcare Nw. Training P'ship v. Evergreen Freedom Found.*, 427 P.3d 688, 696 (Wash. Ct. App. 2018) (holding that a replevin statute applies to electronically stored data because "[t]he question is whether the property may be taken back from the defendant and returned to the plaintiff" and "[e]lectronic data can be both taken and returned"); *Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, No. 14-cv-8467, 2016 WL 5416498, at *7 (S.D.N.Y. Sept. 28, 2016) (holding that a replevin claim for an electronically-stored customer list can survive summary judgment).

Finally, Dr. Navarro insists that the Government has not stated a viable replevin claim because it has not plead the precise value of the Presidential records at issue. *See* MTD 8-9; SJ Opp'n 8-9. This argument fails for several reasons.

First, Dr. Navarro has not cited any support for the proposition that Courts must dismiss replevin actions whenever the plaintiff does not plead specific monetary damages—information that becomes relevant only when the property at issue cannot be returned to the plaintiff and the remedy sought is monetary damages—and imposing such a requirement would serve no purpose. When, as is the case here, the remedy sought is return of the withheld property, the monetary value of the property is irrelevant. D.C. Code § 16–3702 specifies that a replevin plaintiff must demand either of two remedies: "[that the property] be taken from the defendant and delivered to him; *or, if they are eloigned*,[9]

---

[9] To eloign is defined as "[t]o remove (a person or property) from a court's or sheriff's jurisdiction [or] [t]o remove to a distance; conceal." *Eloign*, Black's Law Dictionary (11th ed. 2019).

that he may have judgment of their value and all mesne profits and damages, which he estimates at

_____ dollars, besides costs." D.C. Code § 16–3702 (emphasis added).

The statute's use of the disjunctive "or" demonstrates that monetary value of property only becomes relevant when the property cannot be returned to the plaintiff, and compensation is the sole available remedy. This is consistent with the common law tradition that "[t]he primary relief sought in a replevin is the return of the identical property, and damages are merely incidental." 66 Am. Jur. 2d Replevin § 1. Damages are available as an alternative replevin remedy when return of the property is not possible. Return of the property is not only possible here, Defendant himself has represented that his return of Presidential records will be forthcoming "once the audit is complete and any risk that such a production serves to incriminate him has been alleviated." SJ Opp'n 5. An estimation of the documents' value is therefore legally unnecessary under the D.C. replevin statute. All this Court need do is order Dr. Navarro to produce the Presidential records themselves, whatever their value.

The instant matter is readily distinguishable from the case cited by Defendant, where the court denied default judgment in a replevin action related to equipment. SJ Opp'n 9 (citing *BMO Harris Bank N.A. v. Dist. Logistics, LLC*, No. 20-cv-03425, 2021 WL 7448012, at *4 (D.D.C. Jul. 23, 2021)). In denying a default judgment, the Court cited several issues with the pleadings, the first of which being *both* that the bank did not state the value of the equipment *and* that the bank failed to state that the equipment should be taken and delivered to it. *Id.* at *9. In other words, the complaint in *BMO Harris* failed because the bank failed to plead a demand for either of the two remedies provided under D.C.'s replevin law. Had BMO pleaded that it was seeking return of the equipment, the Court presumably would have allowed the case to proceed without a damages estimate, because such estimate would not have been necessary. The Court would have had an appropriate replevin remedy to provide—return of the withheld property. Here, by contrast, the United States has requested that the withheld emails be taken and delivered to it, making a damages calculation unnecessary. *Cf. Hopkins v. West*, 229 P.3d 560, 565 (Okl. Civ. App. 2009) (reversing a trial court's decision to dismiss a replevin action for failure to plead and prove the monetary value of withheld items where the plaintiff was seeking possession of the items, and therefore was not required to specify their monetary value).

Moreover, the property at issue in *BMO Harris* differs greatly from the property at issue here in a key respect—in *BMO Harris*, the personal property at issue had a value that was readily ascertainable, and thus there was no reason the Plaintiff could not include an estimate of such value in its Complaint. Here, by contrast, the United States cannot accurately determine the monetary value of the records at issue without information that is exclusively in the Defendant's control—namely, the volume and contents of the withheld records. Thus, to require the Government to estimate the monetary value of the property at issue would effectively be to deny the United States the ability to recover the Presidential records at issue unless or until Dr. Navarro provided sufficient information for the Government to estimate the value of such records, effectively preventing the United States from pursuing the recovery of its rightful property.

On the valuation issue, Dr. Navarro misrepresents the Government's position, incorrectly asserting that the Government "readily admits" that the Presidential records sought "do not have the underlying monetary value or mesne profits or damages." SJ Opp'n 9; *see also* MTD 9 (claiming that "the United States concedes that the alleged presidential records at issue do not have a monetary value calculable on their own"). The lack of a statutory requirement aside, it makes little sense to require the Government to plead the value of the Presidential records at issue here because only Dr. Navarro is in a position to know the quantity of Presidential records he possesses. For that reason, the United States has never taken the position that the records it seeks to recover lack monetary value—instead, it explained that "[t]he monetary value of the documents cannot currently be determined because Defendant is the only one with access to the contents of all of the Presidential records" at issue. Compl. ¶ 43, ECF No. 1.

At any rate, the notion that Presidential records have monetary value is not a new one. Prior to the enactment of the PRA, former President Richard Nixon sued the government seeking compensation for records seized after his resignation in 1974. In 1992, the D.C. Circuit concluded that President Nixon had a compensable property interest in such records, and it remanded to the district court "for a determination of the compensation due." *Nixon v. United States*, 978 F.2d 1269, 1270 (D.C. Cir. 1992). After a five-month trial regarding the value of the records at issue—which at one point

Nixon's estate claimed was over $200 million—the Government eventually agreed to pay a settlement of $18 million. *See* U.S. Dep't of Justice, *Government Announces Settlement Over Nixon Presidential Papers* (June 12, 2000), https://www.justice.gov/archive/opa/pr/2000/June/336civ.htm.

In this case, the monetary value of the Presidential records at issue likely turns on the volume and contents of those records. The overall value of the Presidential records at issue in this case could vary based on whether Dr. Navarro is in possession of, for example, 200 records or 2,000 records. And it is easy to imagine that certain Presidential records might command a higher value than others, depending on their subject matter. Of course, the United States has been clear that its primary interest "is in recovering the records and preserving them as required by statute, not in recovering money." Compl. ¶ 43. But that does not render the records valueless. It simply recognizes that the United States has an interest in these records beyond their monetary value.

For the foregoing reasons, the United States' inability to plead a specific monetary value for the Presidential records that it seeks to recover does not foreclose a writ of replevin under D.C. law.

### E. To the extent that the D.C. replevin statute would not permit the recovery of the records, federal common law is available as an alternative.

Even if the United States were precluded from recovering Presidential records under the D.C. replevin statute, federal common law provides an alternative. As explained in the Government's opening brief, federal common law is available where, as here, there is a "uniquely federal interest" and where there is "a significant conflict . . . between an identifiable federal policy or interest and the operational of state law, or the application of state law would frustrate specific objections of federal legislation." SJ Mem. 9-10 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988)).

Dr. Navarro does not and cannot deny that there is a uniquely federal interest in the United States' retention and preservation of Presidential records, or that the application of state law (in the event it prevented the United States from recovering the records at issue in this case) would frustrate specific objectives of the PRA. Instead, Dr. Navarro merely points out that there is no case law specifically invoking federal common law in these precise circumstances. *See* SJ Opp'n 9-10. The lack of case law on point likely reflects that the Government is commonly able to secure the return of

Presidential records without resort to litigation. It is of no moment here, however, because there is also no case law prohibiting the use of federal common law to permit the recovery of unlawfully retained Presidential records. Again, that there is not a case involving the same exact facts as this one does not render it beyond the power of this court to address. And, as the United States has already shown, federal common law provides another basis for issuing a writ of replevin here if recovery is not permissible under D.C.'s replevin statute. *See* SJ Mem. 9-10.

## III.   Defendant's Act of Production Privilege Assertion is Meritless.

Dr. Navarro ultimately resists returning records that he acknowledges do not belong to him by arguing that he "has asserted [the act of production privilege] validly delaying the time within which he must produce the records sought by the Archivist." SJ Opp'n 10. The "act of production" privilege stems from the Fifth Amendment's protection against self-incrimination. Because producing documents "tacitly concedes the existence of the papers demanded and their possession or control by the [party invoking the privilege as well as the party's] belief that the papers are those described in the subpoena," courts have concluded that the act of production could, in some cases, communicate incriminatory statements. *United States v. Fridman*, 974 F.3d 163, 174 (2d Cir. 2020). The applicability of the act of production privilege defies categorization; it inherently turns on the "facts and circumstances of [a] particular case[]." *Fisher v. United States*, 425 U.S. 391, 409-11 (1976).

This Court should reject this purported privilege claim outright. Other than a conclusory, self-serving assertion that the act-of-production privilege applies, Dr. Navarro has made no effort to meet his burden to show why the act of returning Presidential records would constitute impermissible testimonial self-incrimination, or otherwise meet the baseline requirements of a Fifth Amendment privilege. His mere say-so does not unlock a Fifth Amendment defense. Even if Dr. Navarro had a theory for why the act of returning the Government's documents would be inculpatory, the Government's prior knowledge, and Dr. Navarro's prior concessions, render any testimonial implication from Dr. Navarro's production a "foregone conclusion" to which the Fifth Amendment provides no defense. *Fisher*, 425 U.S. at 411. The public nature of "Presidential records" and NARA's statutory role in obtaining and preserving them also precludes Dr. Navarro's privilege assertion: The

Fifth Amendment does not apply where, as here, the records in question are "vested with a public character" and are required to be maintained by law. *United States v. Hubbell*, 530 U.S. 27, 35 (2000) ("[T]he fact that incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return, maintaining required records, or reporting an accident, does not clothe such required conduct with the testimonial privilege.") (internal citations omitted). Here, the PRA requires the return of records that Mr. Navarro admits that he possesses, but which belong to the United States. Under these circumstances, requiring the production of documents that belong to the United States does not implicate the Fifth Amendment right against self-incrimination. *Accord Hubbell*, 530 U.S. at 35-37.

### A. Dr. Navarro fails to carry his burden to establish the requisite elements of the privilege.

Although Dr. Navarro asserts that he "reasonably believed that the production of records to the United States risked the implication of his Fifth Amendment right against self-incrimination," SJ Opp'n 3, he "is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified[.]" *Hoffman v. United States*, 341 U.S. 479, 486 (1951) (citation omitted).

As the party seeking to invoke the act of production privilege, Dr. Navarro bears the burden to demonstrate its applicability. *In re Grand Jury Subpoena*, 973 F.2d 45, 50 (1st Cir. 1992). But Dr. Navarro provides no evidentiary or factual support for his privilege assertion; his claim is pure *ipse dixit*. Dr. Navarro's privilege assertion therefore fails outright. *Bayview Loan Servicing, LLC v. McNaughton*, No. 2:05-cv-254, 2007 WL 2433996, *2 (W.D. Mich. 2007) ("The party does not discharge the burden simply by asserting that he will incriminate himself by producing the documents."). In *Bayview Loan Servicing*, for example, the court rejected the claimant's act of production privilege claim based on a "'disorganized array of documents,' along with only a general blanket assertion of fifth amendment privilege." *Id.* at *3 (quoting *United States v. Dean*, 23 F. App'x 448, 450 (6th Cir. 2001)). The record here does not even have that—it contains nothing. Dr. Navarro has made no attempt to explain why his production of any or all of the PRA records he has improperly retained would incriminate him,

given that (i) the United States already knows that he has Presidential records; *see* Compl., Ex. 3, ECF No. 1-4 (December 16, 2021 Letter from Gary M. Stern, NARA General Counsel, to Dr. Peter J. Navarro (referencing Dr. Navarro's use of a private email account to conduct official business)) & Compl., Ex. 2, ECF No. 1-3 (providing specific examples of missing documents); and (ii) Dr. Navarro has previously acknowledged that he has them. *See* Bosanko Decl. ¶ 9 (referencing representations of Dr. Navarro's counsel in July 29, 2022 correspondence acknowledging Dr. Navarro's possession of hundreds of Presidential records). It bears emphasizing that Dr. Navarro has to date declined to produce even a single Presidential record in his possession, though he evidently has at least hundreds. *See id.* This disparity renders Dr. Navarro's wholesale lack of evidentiary support for his privilege assertion particularly significant. Because Dr. Navarro has failed to demonstrate the requisite nexus between his act of producing Presidential records in his possession and the ostensible criminal jeopardy that he claims would result from that production, his act of production privilege assertion must fail.

**B. On the merits, Dr. Navarro's claim of privilege fails.**

Even setting aside Dr. Navarro's threshold failure of proof, his privilege assertion is fatally deficient as a matter of law. For this "narrow" privilege to apply, *Fridman*, 974 F.3d at 174, Dr. Navarro must demonstrate that his return of Presidential records would involve compelled testimonial self-incrimination in violation of the Fifth Amendment. Dr. Navarro does not and cannot meet this burden.

The act of production is "testimonial" for Fifth Amendment purposes only if such production would "compel[] the individual to use 'the contents of his own mind' to explicitly or implicitly communicate some statement of fact." *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1345–46 (11th Cir. 2012) (citing *Curcio v. United States,* 354 U.S. 118, 128 (1957)). That testimonial aspect is lacking. The Fifth Amendment is not implicated where—as here—the Government "already knew of the materials[]" "at the time it sought to compel the act of production, . . . thereby making any testimonial aspect a 'foregone conclusion.'" *Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d at 1346. Where the Government has prior knowledge of the records sought, the Fifth Amendment is not implicated "even if the act [of production] conveys a fact regarding the existence or location, possession, or authenticity of the subpoenaed materials[.]" *Id.* As NARA's

communications with Dr. Navarro dating back to December 2021 make clear, NARA has long known that Dr. Navarro had (and continues to have) Presidential records in his possession related to his service as a White House advisor. Accordingly, there can be no dispute that the Government has prior knowledge of the material. In fact, it was that prior knowledge that led NARA to initiate efforts to recover documents that Dr. Navarro had on his private email.

It is immaterial that the Government cannot determine the precise number of Presidential records that Dr. Navarro has retained. To fulfill this prior knowledge requirement, the Government "need not demonstrate perfect knowledge of each specific responsive document." *United States v. Greenfield*, 831 F. 3d 106, 116 (2d Cir. 2016). Rather, the Government "must establish its knowledge only 'with reasonable particularity.'" *Id.* (quoting *In re Grand Jury Subpoena Duces Tecum Dated October 29, 1992*, 1 F.3d 87, 93 (2d Cir. 1993). In light of the Government's extensive efforts to recover the Presidential records in Dr. Navarro's possession prior to seeking a writ of replevin, there can be no serious question that the Government adequately described the materials it seeks. *See* Compl., Ex. 3, ECF No. 1-4 (referencing Dr. Navarro's use of a private email account to conduct official business) & Compl. Ex. 2, ECF No. 1-3 (providing specific examples of missing documents). Because any resulting testimonial aspects of Dr. Navarro returning Presidential records are therefore a "foregone conclusion," Dr. Navarro cannot meet his burden to show that the act of returning Presidential records would violate the Fifth Amendment.

Finally, even if Dr. Navarro's production of Presidential records were deemed testimonial, the records sought here would fall entirely outside the ambit of the Fifth Amendment. As the Supreme Court has recognized, the Fifth Amendment is not violated when the Government is allowed "to gain access to items or information vested with [a] public character." *Baltimore City Dep't of Social Servs. v. Bouknight,* 493 U.S. 549, 557 (1990). This "required records exception" "abrogates the protection of the [Fifth Amendment] privilege for a subset of those documents that must be maintained by law." *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d 339, 344 (2d Cir. 2013) (citing *Shapiro v. United States,* 335 U.S. 1, 68 (1948)). Central to the analysis is whether the "records themselves must have assumed 'public aspects' which render them at least analogous to public documents." *In re Grand Jury*

*Subpoena Dated Feb. 2, 2012*, 741 F.3d at 345 (citing *Grosso v. United States*, 390 U.S. 62, 67-68 (1968)). The documents here, of course, are not merely "analogous to public documents," they *are* public documents as defined by the PRA. 44 U.S.C. § 2202 ("The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter."). Upon conclusion of a President's term of office, the Archivist of the United States "shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." 44 U.S.C. § 2203(g)(1). "The Archivist shall have an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of this chapter." *Id.* Dr. Navarro's arguments, if accepted, would render it impossible for the Archivist to fulfill his statutory obligations under the PRA, and would frustrate the statute's purpose of "ensur[ing] the preservation of presidential records for public access after the termination of a President's term in office." *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) (citing H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. 2 (1978)). For all of the foregoing reasons, Dr. Navarro's act-of-production privilege assertion is wholly without merit.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss, grant Plaintiff's Motion for Summary Judgment, and issue a writ of replevin ordering the return of all Presidential records in Dr. Navarro's possession to the United States.

Dated:  November 4, 2022                                  Respectfully submitted,

                                                          BRIAN M. BOYNTON
                                                          Principal Deputy Assistant Attorney
                                                          General

                                                          BRIAN D. NETTER
                                                          Deputy Assistant Attorney General

                                                          ELIZABETH J. SHAPIRO
                                                          Deputy Branch Director
                                                          Federal Programs Branch

  /s/ Lee Reeves
LEE REEVES
ALEXANDRA SASLAW
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs
Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 616-0773
Email: lee.reeves2@usdoj.gov

*Counsel for Plaintiff*