UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>       Plaintiff,<br><br>     v.<br><br>PETER K. NAVARRO,<br>       Defendant. | Civil Action No. 22-2292 (CKK) |

**MEMORANDUM OPINION AND ORDER**
(February 20, 2024)

This matter concerns Defendant's compliance with this Court's judgment as it relates to the production of Presidential records in Defendant's control. On March 9, 2023, the Court granted Plaintiff's motion for summary judgment, and ordered Defendant to, among other things, meet and confer with Plaintiff and propose "search terms and methodology . . . to unequivocally identify Presidential records in Defendant's possession." Order & Judgment, ECF No. 15. On April 12, 2023, the Court adopted the parties' joint proposal, *see* ECF No. 24, and ordered Defendant to "complete all searches for Presidential records" no later than May 8, 2023, *see* Minute Order (Apr. 12, 2023). The Court further ordered the parties to file a joint status report by May 15, 2023, proposing a deadline "by which Defendant will produce the remaining Presidential records in his possession." *Id.* Despite these court orders, Defendant refused to conduct all subsequent searches as required. *See* ECF No. 27 at 2. On May 19, 2023, the Court issued another order to enforce its earlier judgment, directing Defendant to "search for and identify all Presidential records generated across any and all of his personal accounts on which he transacted official business," using certain search parameters "at a minimum." Order, ECF No. 28, at 2. Defendant was also ordered to provide all Presidential records to Plaintiff based on those search results no later than May 25,

1

2023.  *Id.*

Then, on May 31, 2023, Plaintiff moved to enforce the Court's judgment, Mot. to Enforce ("Motion" or "Mot."), ECF No. 30, claiming Defendant is still noncompliant with the Court's judgment.  On August 31, 2023, the Court granted in part Plaintiff's Motion, and ordered Defendant to explain his compliance with the Court's judgment in this case.  Order, ECF No. 32, at 2.  However, the Motion was held in abeyance to the extent Plaintiff "requests an order directing Defendant to show cause why he should not be held in contempt of the Court's judgment."  *Id.* Defendant suggested and the Court adopted Defendant's proposal to review Defendant's upcoming submissions, including Defendant's sealed notice "listing all search terms used, the metadata fields searched, and the email accounts searched" and a "random sample of fifty emails across each account searched that were not identified as responsive in his last review."  *Id.* at 1–2.  On October 16, 2023, Defendant filed a sealed notice detailing his compliance with the Court's judgment.  *See* ECF No. 33 (sealed).  The Court also received a random sample of records that Defendant previously had not identified as responsive.  These records have been maintained under seal.  Order, ECF No. 32, at 2.  The Court has carefully reviewed the random sample of emails (and the corresponding attachments) provided by Defendant to ascertain whether Defendant has in fact retained Presidential records, as Plaintiff contends.  With its review complete, the Court turns to the resolution of Plaintiff's [30] Motion to Enforce.

Under the Presidential Records Act ("PRA"), a Presidential record is a record generated or received by a covered employee in the course of assisting with the discharge of the President's official duties.  *See* 44 U.S.C. § 2201(2).  The term "Presidential record" was intentionally drafted broadly.  *See Am. Hist. Ass'n v. Peterson*, 876 F. Supp. 1300, 1307 (D.D.C. 1995) (CRR) (explaining the legislative history clarifies that the scope is "very broad since a great number of

what might ordinarily be construed as one's private activities are, because of the nature of the presidency, considered to be of public nature, *i.e.*, they effect the discharge of [the President's] official or ceremonial duties.").

Patently, the term does not include "personal records," which is defined as "all documentary materials, or any reasonably segregable portion thereof, of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(3). Of relevance here, the PRA includes three categories of materials that constitute "personal records":

> (A) diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of transacting Government business;
> (B) materials relating to private political associations, and having no relation to or direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; and
> (C) materials relating exclusively to the President's own election to the office of the Presidency; and materials directly relating to the election of a particular individual or individuals to Federal, State, or local office, which have no relation to or direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President.

*Id.* § 2201(3)(A)–(C). Given these definitions, the classification between a Presidential record and a personal record can hinge on what the covered employee prepared the material for, and what he did with the material. *See Jud. Watch, Inc. v. Nat'l Archives & Records Admin.*, 845 F. Supp. 2d 288, 301 n.9 (D.D.C. 2012) (ABJ).

It is undisputed that Defendant was a covered employee under the PRA. Statement of Materials Facts ("SMF"), ECF No. 7-2, ¶ 6. Defendant was employed in the Executive Office of the President from January 20, 2017 until January 20, 2021. *Id.* ¶ 1. Between January 20, 2017 until April 29, 2017, Defendant served as the Deputy Assistant to the President, Director of Trade

and Industrial Policy, and the inaugural head of the White House National Trade Council. *Id.* ¶ 2. For the remainder of his employment in the White House Office, Defendant served as Assistant to the President and Director of the Office of Trade and Manufacturing Policy. *Id.* ¶ 3. Defendant was also appointed to coordinate the government's use of the Defense Production Act, 50 U.S.C. § 4501 *et seq.*, to respond to the COVID-19 pandemic. *Id.* ¶ 5. Therefore, as the Court has already concluded in its prior judgment, *see* ECF No. 15 at 3, the United States is the rightful owner of the Presidential records created or received by Defendant in the course of assisting with the discharge of the President's official duties, *see* 44 U.S.C. §§ 2201(2), 2202.

The Court now turns to the random sampling of records provided by Defendant that were previously identified as nonresponsive. In October 2023, Defendant provided for the Court's review fifty (50) emails, with some corresponding attachments. Upon consideration of the definitions provided by the PRA, as well as Defendant's role in the White House Office during the applicable period, the Court concludes that at least twenty-two (22) (i.e., 44%) of the fifty emails are not Presidential records. Conversely, the Court concludes that at least twelve (12) of those emails (i.e., 24%) are Presidential records.

For the remaining materials, which comprises of sixteen (16) emails (and some attachments), a conclusion cannot be reached at this stage. The Court cannot determine whether these materials are Presidential records or personal records, as their classification depends on why Defendant prepared them and/or what he did with them. *See, e.g., Jud. Watch, Inc.*, 845 F. Supp. 2d at 301 n.9. For instance, four (4) of these records appear to be journal entries in which Defendant writes about various aspects of his life. But the mere fact that the material is a journal entry does not mean it is a personal record, particularly as the journal entries include work-related topics. *See* 44 U.S.C. § 2201(3)(A) (personal records include "diaries, journals, or personal notes

4

. . . which are *not prepared or utilized for* . . . transacting Government business[.]") (emphasis added).  Similarly, many of these records relate to the 2020 Presidential Election and were either generated or received in late-November 2020 to early-January 2021.  Once again, although these records relate to a Federal election, it does not mean that they automatically become a "personal record."  *See id.* § 2201(3)(C).  To obtain such status, the materials must "have *no relation to or direct effect* upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President."  *Id.* (emphasis added).

Overall, the Court calculates that at least 24% of the materials provided in the random sampling are Presidential records as that term is defined under the PRA.  But, since sixteen of these records (i.e., 32%) cannot be classified as either a Presidential record or a personal record at this time, the error rate in this case ranges from 24% to 56%.  In the FOIA context, an error rate of 25%, particularly when coupled with "intransigen[ce]" by the producing party, is "unacceptably high" and suggests that many documents have been improperly withheld.  *Meeropol v. Meese*, 790 F.2d 942, 960 (D.C. Cir. 1986); *see, e.g.*, *Clemente v. F.B.I.*, 854 F. Supp. 2d 49, 59 (D.D.C. 2012) (BJR) (an error rate of 26.5% required complete reprocessing); *cf. Citiz. for Resp. & Ethics in Washin. v. U.S. Dep't of Just.*, 48 F. Supp. 3d 40, 52 (D.D.C. 2014) (an error rate of 1% is not sufficient to prompt further disclosures); *Shapiro v. Dep't of Just.*, No. 12-cv-313, 2020 WL 3615511, at *41 (D.D.C. July 2, 2020) (BAH) (a "potential" error rate of 16%, when coupled with the agency's "diligent processing," is insufficient to justify complete reprocessing).

In sum, based on the Court's review of Defendant's random sampling, it is clear that Defendant continues to possess Presidential records that have not been produced to their rightful owner, the United States.  It is likewise clear that Defendant's error rate is not minimal or negligible, and is likely "unacceptably high."  Given Plaintiff's difficulty in obtaining its

Presidential records, additional supervision of Defendant's compliance with this Court's judgment is warranted. To accomplish this goal, the Court shall refer this matter to a magistrate judge to ensure that Defendant provides all Presidential records to Plaintiff, including but not limited to the twelve records already identified by this Court.

Accordingly, Plaintiff's [30] Motion to Enforce is **GRANTED**. Defendant is ordered to **SHOW CAUSE** why he should not be held in contempt of the Court's judgment, on or before **March 21, 2024.** Upon receipt of Defendant's response to the Court's Show Cause Order, the Court shall refer this matter to a magistrate judge for supervision, with the aim of bringing this litigation to its final resolution. The magistrate judge shall also review the sixteen records in Defendant's random sampling to determine whether those records are Presidential records or personal records. Meanwhile, the Court directs Defendant to reprocess the remaining records in his possession on or before **March 20, 2024**, which appears to be approximately 600 records, *see* ECF No. 31 at 3, in accordance with this Memorandum Opinion and Order to determine whether additional records are identified as responsive and can be produced to Plaintiff prior to this matter being assigned to a magistrate judge. Defendant's production to Plaintiff shall include the twelve records (the emails and any corresponding attachments) identified by this Court to be Presidential records: DCD Review 2; DCD Review 6; DCD Review 137; DCD Review 251; DCD Review 389; DCD Review 434; DCD Review 438; DCD Review 452; DCD Review 483; DCD Review 480; DCD Review 519; and DCD Review 526.

**SO ORDERED**.

Date:  February 20, 2024

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge